Filed 3/23/26  P. v. Busch CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>CRAIG BUSCH,<br><br>　　　Defendant and Appellant. | A171681<br><br>(Lake County<br>Super. Ct. No. CR968271) |

Defendant and appellant Craig Busch, who had been sentenced to life in prison for first degree murder, was released on lifetime parole in 2019 under Penal Code section 3000.1, subdivision (a)(1).[1]  In 2023, the trial court found that he violated the conditions of his parole and remanded him to the California Department of Corrections and Rehabilitation (CDCR) as required by section 3000.8, subdivision (h).  But under section 3000.01, a statute adopted by the Legislature in 2020, Busch would not have been remanded to CDCR for his parole violation if he had been released after June 30, 2020.  (See *People v. Reed* (2024) 103 Cal.App.5th 43, 54–55 (*Reed*).)  On appeal, he contends that this disparity in punishment based solely on the date of his release on parole violates equal protection principles.  He further contends that there is insufficient evidence to establish that he made any criminal

_____

[1] All further statutory references are to the Penal Code.

1

threats in violation of the conditions of his parole. Finally, he contends that a factual misstatement in a minute order should be corrected. We agree that the minute order should be corrected but reject the other contentions and affirm in all other respects.

## BACKGROUND

Busch was convicted of first degree murder (§ 187) and sentenced to prison for 25 years to life. He was released on lifetime parole on July 18, 2019.

On September 5, 2023, the Division of Adult Parole Operations of CDCR filed a petition to revoke Busch's parole. The petition alleged that Busch violated the conditions of his parole by committing assault with a deadly weapon, a vehicle (§ 245), and making criminal threats (§ 422).

At the hearing on the petition, the victim, a police officer, and Busch's parole agent testified on behalf of the People.

The victim, who understood "a little bit of English,"[2] testified that he was getting gas at a Tower Mart on July 18, 2023, when Busch pulled up behind him in his truck. Busch left his truck to put some garbage in a trash can next to the gas pump that the victim was using. According to the victim, Busch looked at him in an "unfriendly" manner.

After he finished pumping gas, the victim testified that he got into his car and began looking for his keys. He then felt something hit his car from behind. He got out and accused Busch of hitting his car. Busch responded, " 'Yes, I hit you. And I'm ready to hit you again if you don't get the fuck out of here.' " The victim then returned to his car and drove to the middle of the gas station parking lot.

---

[2] During cross-examination, the victim testified that he understood about 10 percent "of what somebody said in English when" he was "nervous."

After leaving his car to talk to the gas station clerk, the victim returned to his car and called the police.  At that time, Busch, who was standing three to four feet from the victim's car, asked the victim what he was doing.  When the victim told him he was calling the police, Busch "said, 'No matter who you call, they're not going to do anything to me.  And I want you to leave my town, you fucking Mexican Beaner.' "

The victim then testified that he asked Busch to "get away" from him.  In response, Busch "kept saying, 'Leave my town because I'm going to fuck you up.' "  The victim testified that Busch made him feel "threatened" through his words, "tone," facial expressions, "gestures," and "body language," and that he understood that Busch "was going to beat [him] up."  The victim, however, acknowledged that he did not remember the "exact words" used by Busch.  He also acknowledged that he did not notice any damage to his car and that Busch never struck him.  The victim eventually went into the Tower Mart to wait for the police and Busch left.

Deputy Sheriff Michael Nakahara testified that the victim told him that Busch threatened him and hit his car twice.  Deputy Nakahara also testified that Busch told him he got into an argument with the victim at Tower Mart but did not hit the victim's car or threaten him.  Artemiza Avalos, Busch's parole agent, testified that Busch told her he got into an argument with the victim at Tower Mart but denied hitting the victim's car.  He, however, told Avalos that his truck did roll towards the victim's car because he forgot "to put on the brake" or "put it in park" but that he stopped the truck before it hit the victim's car.

Busch called four witnesses, including himself.  But only two of those

witnesses testified about the Tower Mart incident.[3]

Busch testified that after waiting a long time for the victim at the Tower Mart gas pump, he honked his horn and yelled at the victim to move his car. According to Busch, the victim exited his car and approached him. As Busch "stepp[ed] out" of his truck, the truck started "rolling forward" so he got back in his truck and stopped it. He then claimed that the victim confronted him about hitting his car and repeatedly said, " 'Do you want to hit me?' " and " 'You're going to be in trouble.' " Busch claimed that he told the victim, " 'I didn't fucking hit you.' " Busch further testified that he never threatened the victim or touched the victim or his car and that the victim was "aggressive" and did not seem threatened. Busch also denied using any racial slurs. He did, however, admit to "cursing at" the victim.[4]

William Lyons, a passenger in Busch's truck at the time of the Tower Mart incident, testified that Busch never hit the victim's car, never threatened the victim, and never struck the victim. He corroborated Busch's claim that his truck started rolling towards the victim's car but that Busch stopped the truck before it hit the car. Lyons also claimed that the victim refused to move his car and threatened to have Busch "killed."

At the end of the hearing, the trial court found that Busch "bumped" the victim's car but did not find that he "intentionally" did so. But after finding Busch's and Lyons' testimony not "trustworthy" or credible, the court found by "a preponderance of the evidence" that Busch "made threatening statements to the victim and [that] the victim was in fear." According to the

---

[3] Because only the testimony about the Tower Mart incident is relevant to this appeal, we do not describe the testimony of Busch's other two witnesses.

[4] For example, Busch testified that he told the victim " 'Get the fuck away from my truck and if you think I fucking hit you, call the cops.' "

4

court, "if this was a criminal case," it would treat the threats as "a misdemeanor . . . ." Based on this finding, the court found that Busch "did violate the terms and condition of his parole." It then remanded Busch into the custody of CDCR "for a determination as to whether he should be re-paroled or be sanctioned."

Pursuant to our order granting Busch's Motion for Constructive Filing of Notice of Appeal, the trial court filed his notice of appeal.

## DISCUSSION

### A. Equal Protection Claim

Under section 3000.1, subdivision (a)(1), an inmate sentenced to "a maximum term of life imprisonment" for "first or second degree murder" may be released on parole for "the remainder of the inmate's life."[5] And if the inmate violates any conditions of the lifetime parole imposed under section 3000.1, then he "shall be remanded to the custody of" CDCR "for the purpose of future parole consideration." (§ 3000.08, subd. (h).)[6] In 2020, however, the Legislature "passed Senate Bill No. 118 (2019–2020 Reg. Sess.) . . ., which implemented section 3000.01." (*Reed*, *supra*, 103 Cal.App.5th at p. 52.) Section 3000.01 applies to inmates "who are subject to supervision under section 3000.08 and were released from state prison on or after July 1, 2020"

---

[5] Section 3000.1, subdivision (a)(1), states: "In the case of any inmate sentenced under Section 1168 for any offense of first or second degree murder with a maximum term of life imprisonment, the period of parole, if parole is granted, shall be the remainder of the inmate's life."

[6] Section 3000.08, subdivision (h), states: "Notwithstanding any other law, if Section 3000.1 or paragraph (4) of subdivision (b) of Section 3000 applies to a person who is on parole and the court determines that the person has committed a violation of law or violated his or her conditions of parole, the person on parole shall be remanded to the custody of the Department of Corrections and Rehabilitation and the jurisdiction of the Board of Parole Hearings for the purpose of future parole consideration."

5

and "limits parole terms to three years for inmates serving a life sentence."[7] (*Reed*, at p. 52.)

In reconciling these statutory provisions, the Court of Appeal in *Reed* concluded that sections 3000.1 and 3000.08, subdivision (h), no longer apply to parolees released on or after July 1, 2020. (*Reed*, *supra*, 103 Cal.App.5th at pp. 53–54.) As a result, after June 30, 2020, an inmate serving a life sentence for murder may only be released subject to a parole term of three years. (*Id.* at pp. 52–53.) And if that inmate violates the conditions of his parole, he may no longer be punished under section 3000.08, subdivision (h). Instead, he "may be punished only as provided in [section 3000.08,] subdivisions (f) and (g) *for any parole violation . . . .*" (*Reed*, at pp. 54–55.) Those subdivisions, in turn, give the trial court "discretion to modify or revoke parole, including the authority to sentence the person to county jail for up to 180 days, or refer the person to a reentry court or other evidence-based program."[8] (*Id.* at p. 51.)

Because he was released on lifetime parole before July 1, 2020, Busch acknowledges that section 3000.01 does not apply to him. Nonetheless, he

---

[7] Section 3000.01, subdivision (b), states in relevant part: "Except as provided in subdivision (d) and notwithstanding any other law, persons described in subdivision (a) shall serve a parole term as follows: [¶] . . . [¶] (2) Any inmate sentenced to a life term shall be released on parole for a period of three years. . . ."

[8] Section 3000.08, subdivision (f) states in relevant part: "Upon a finding that the person has violated the conditions of parole, the court shall have authority to do any of the following: [¶] (1) Return the person to parole supervision with modifications of conditions, if appropriate, including a period of incarceration in a county jail. [¶] (2) Revoke parole and order the person to confinement in a county jail. [¶] (3) Refer the person to a reentry court pursuant to Section 3015 or other evidence-based program in the court's discretion." Subdivision (g) then establishes that: "Confinement pursuant to paragraphs (1) and (2) of subdivision (f) shall not exceed a period of 180 days in a county jail."

6

contends that remanding him to CDCR pursuant to section 3000.08, subdivision (h), violates equal protection principles because an inmate serving the same life sentence for committing the same crime would be eligible for punishments other than mandatory remand to CDCR solely because he was released on parole after June 30, 2020. He further contends that the Court of Appeal in *People v. Batten* (2025) 109 Cal.App.5th 908 (*Batten*) erred in rejecting this very same contention. We, however, agree with *Batten* and reject Busch's equal protection challenge.[9]

"When a party challenges a law 'drawing distinctions between identifiable groups or classes of persons, on the basis that the distinctions drawn are inconsistent with equal protection, . . . [t]he only pertinent inquiry is whether the challenged difference in treatment is adequately justified under the applicable standard of review.' " (*Batten*, *supra*, 109 Cal.App.5th at pp. 912–913.) At a minimum, that unequal treatment " ' "must be rationally related to a legitimate governmental purpose." ' " (*People v. Williams* (2024) 17 Cal.5th 99, 122 (*Williams*).) But "[i]f the unequal treatment involves a suspect class or fundamental right, then we apply strict scrutiny and ' " '*the state* bears the burden of establishing not only that it has a *compelling* interest which justifies the law but that the distinctions drawn by the law are *necessary* to further its purpose.' " ' " (*Ibid*.)

In rejecting an equal protection challenge to the remand of a lifetime parolee to CDCR under section 3000.08, subdivision (h), after July 1, 2020, the Court of Appeal in *Batten* concluded that rational basis review, rather

---

[9] Because Busch raises a facial constitutional challenge, we find no forfeiture even though he failed to raise it below. (See *People v. Gonzalez* (2020) 57 Cal.App.5th 960, 975 [" 'the forfeiture rule does not extend to facial constitutional challenges presenting pure questions of law that can be resolved without referring to the particular sentencing record developed below' "].)

than strict scrutiny, applied because the challenge did not implicate a "fundamental interest in personal liberty."[10] (*Batten*, *supra*, 109 Cal.App.5th at p. 913.) Distinguishing *People v. Olivas* (1976) 17 Cal.3d 236 (*Olivas*), the court held that a " 'defendant . . . "does not have a fundamental interest in a specific term of imprisonment or in the designation a particular crime receives." ' " (*Batten*, at p. 913.)

The Court of Appeal in *Batten* then found a "rational reason" for distinguishing between parolees released before and after July 1, 2020. (*Batten*, *supra*, 109 Cal.App.5th at p. 914.) Because the Board of Parole Hearings (Board) offers parole "in part based on conditions of treatment or control on parole," the Board could "determine that some inmates would only be suitable for parole if subject to the heavy consequence of a mandatory remand to CDCR custody for a parole violation." (*Ibid.*) Thus, the "Legislature could reasonably decide that upending these Board considerations by . . . releasing [inmates] from the mandatory consequences for a parole violation would be unwise, and . . . therefore rationally choose to make section 3000.01 operate prospectively only." (*Id.* at pp. 914–915.)

Busch contends that *Batten* erred by declining to follow *Olivas* and apply strict scrutiny. According to Busch, "disparate treatment of individuals convicted of the *same* crime and sentenced to the *same* punishment, but with varying consequences for a parole revocation based entirely on their date of parole," implicates the same fundamental liberty interest implicated in *Olivas* and must therefore be subject to strict scrutiny. But *Olivas*—which found that disparate punishments given to a juvenile between the age of 16 and 21 who was convicted of a crime as an adult and an adult convicted of that same crime violated equal protection principles—"has been limited by

_____

[10] The parties agree that there is no suspect class involved here.

8

subsequent decisional law." (*In re Thai* (2025) 117 Cal.App.5th 1, 20.)  As explained by our high court, *Olivas* only requires strict scrutiny when "the boundaries between the adult and juvenile criminal justice systems" are not "maintained," such as when "an individual face[s] a longer period of confinement if treated as a juvenile rather than as an adult." (*People v. Wilkinson* (2004) 33 Cal.4th 821, 837–838.)  Otherwise, the Legislature has broad discretion in " 'defining crimes and specifying punishment.' " (*Williams*, *supra*, 17 Cal.5th at p. 123.)  And "[w]here, as here, the question involves the possible retroactive application of a more beneficial sentencing scheme, defendant has no fundamental liberty interest at stake." (*People v. Lynch* (2012) 209 Cal.App.4th 353, 359 (*Lynch*).)

Busch also contends that the rationale proffered in *Batten* to justify the unequal treatment of parolees sentenced to life imprisonment for murder who were released on parole before July 1, 2020 cannot satisfy rational basis review.  In support, he claims that he is similarly situated to the defendant in *Reed*, who was not remanded to CDCR even though he was sentenced to life in prison for murder, was initially paroled for life before July 1, 2020, and committed a parole violation after June 30, 2020.  But unlike Busch, the defendant in *Reed* was also released on parole a second time *after* June 30, 2020. (*Reed*, *supra*, 103 Cal.App.5th at p. 47.)  Thus, section 3000.01 did apply to the defendant in *Reed*. (*Reed*, at p. 54.)  By contrast, section 3000.01 does not apply to Busch because he was never released on parole after June 30, 2020.

We therefore reject Busch's equal protection challenge.  In doing so, we not only follow *Batten*, we also follow the many cases holding that a " 'reduction of sentences only prospectively from the date a new sentencing statute takes effect is not a denial of equal protection.' " (*People v. Floyd*

(2003) 31 Cal.4th 179, 189; see also, e.g., *Lynch*, *supra*, 209 Cal.App.4th at p. 359 ["The right to equal protection of the law generally does not prevent the state from setting a starting point for a change in the law"].)

## B.     Sufficiency of the Evidence Claim

Busch contends that there is insufficient evidence that he made criminal threats in violation of the conditions of his parole. We disagree.

We review an order revoking parole for abuse of discretion and the trial court's factual findings for substantial evidence. (*People v. Butcher* (2016) 247 Cal.App.4th 310, 318 [probation revocation]; *People v. Shepherd* (2007) 151 Cal.App.4th 1193, 1198 ["Parole revocation and probation revocation after the imposition of a sentence are constitutionally indistinguishable"].) "The substantial evidence standard 'gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' [Citation.] . . . 'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge [in a court trial] . . . to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' " (*People v. Mumin* (2023) 15 Cal.5th 176, 202.)

Busch contends that the victim's testimony was insufficient to establish that Busch uttered any verbal threats because the victim's understanding of English was poor. (See § 422 [criminal threat must be conveyed by a "statement, made verbally, in writing, or by means of an electronic communication device"]; *People v. Gaines* (2023) 93 Cal.App.5th 91, 140 (*Gaines*) [section 422 requires "some words or sound"].) But the victim testified that he understood English "a little." And given the simplistic nature of the verbal threats made by Busch, the trial court could reasonably

find the victim's recitation of Busch's words to be largely accurate and credible. Finally, the court could reasonably infer that Busch uttered verbal threats even if the victim understood only 10 percent of what Busch said based on Busch's threatening tone, facial expressions, gestures, and body language at the time he spoke. (See *Gaines*, at p. 140 ["combination of words and gestures may be sufficient" to establish a "criminal threat"].) Accordingly, the victim's testimony was more than sufficient to establish that Busch made criminal threats in violation of the conditions of his parole. (§ 422.)

### C. Minute Order

The trial court's minute order following Busch's parole revocation hearing on November 29, 2023 states: "Court finds that the defendant made threatening statements to the victim and the victim was in fear. *Court does not find any criminal conduct other than the bumping of the car.* Court does find that it took place but cannot find if it was intentional." (Italics added.) Busch contends that the italicized language is misleading because it suggests that he committed "criminal conduct" by "bumping the [victim's] car" even though the court found otherwise. At oral argument the People conceded that the court did not find that Busch committed criminal assault but maintained that the minute order is not misleading. We find that the italicized language arguably suggests that Busch's bumping of the victim's car was "criminal conduct." To avoid any unnecessary confusion, we therefore order that the italicized language in the minute order be corrected to state: "Court does not find any other potentially criminal conduct other than the bumping of the car."

11

## DISPOSITION

We order that the third sentence in the second to last paragraph of page 2 of the minute order titled "Revocation—Parole—Minutes (Amended on 10/6/2025 by Danielle Andre)" be replaced with the following sentence: "Court does not find any other potentially criminal conduct other than the bumping of the car."  In all other respects, the judgment is affirmed.

CHOU, J.

We concur.

JACKSON, P. J.
SIMONS, J.

A171681/ *P. v. Busch*

12